Cole S. Cannon (12053)
Austin J. Hepworth (13238)
CANNON LAW GROUP, PLLC
53 S. 600 E.
Salt Lake City, Utah  84102
(801) 363-2999
cole@cannonlawgroup.com
austin@cannonlawgroup.com

*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KYLE BATEMAN; PAUL LAMBERT; BRUCE MILLER; TOM SAWYER; LAMBERT TECHNOLOGY INCORPORATED,  Utah Corporation; RANDALL B BATEMAN IRA; JOHN CURTIS; JEFF CROOK; PL WOOLSTENHULME FLP; SIBYL NOBLE; KIM BATEMAN; BATEMAN IP LAW GROUP, A PROFESSIONAL CORPORATION, a Utah Corporation; LOU ANN LAMBERT; JOE MARTEL; DAVID KNIGHT; SPENCER LAMBERT; ROBERT LAMBERT; BEN FREI; NELLY BATEMAN; TAZ MURRAY; JASON SCHMID; ROCKY MOUNTAIN WINGS, LLC, a Utah Limited Liability Company; TYLER ANDERSEN; and DEAN ANDERSEN,<br>　　　　Plaintiffs,<br><br>v.<br><br>JAB WIRELESS, INC., a Colorado Corporation,<br>　　　　Defendant. | **SECOND AMENDED COMPLAINT**<br><br>Civil No.: 2:14-cv-00147-RJS<br><br>Judge: Robert J. Shelby |

COMES NOW Kyle Bateman, Paul Lambert, Bruce Miller, Lambert Technology Incorporated, Tom Sawyer, Randall B Bateman IRA, John Curtis, Jeff Crook, PL Woolstenhulme FLP, Sibyl Noble, Kim Bateman, Bateman IP Law Group, a Professional Corporation, Lou Ann Lambert, Joe Martel, David Knight, Spencer Lambert, Robert Lambert, Ben Frei, Nelly Bateman, Taz Murray, Jason Schmid, Rocky Mountain Wings, LLC, Tyler Andersen and Dean Andersen, the Plaintiffs, by and through their counsel, and allege as follows in this Second Amended Complaint:

## PARTIES

1.  Kyle Bateman ("Bateman") is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

2.  Paul Lambert ("Lambert") is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

3.   Bruce Miller is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

4.  Lambert Technology, Incorporated is a Utah corporation whose home office is located in Utah and who is a resident and a citizen of Utah and is a shareholder of JAB Wireless, Inc.

5.  Tom Sawyer is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

6.  Randall B Bateman IRA is an IRA held by Randall B Bateman in Utah and Randall B Bateman is a resident and citizen of Utah. Randall B Bateman IRA is a shareholder of JAB Wireless, Inc.

7.  John Curtis is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

8.  Jeff Crook is an individual that resides in and is a citizen of the U.S. Virgin Islands and is a shareholder of JAB Wireless, Inc.

9.  PL Woolstenhulme FLP is located in Utah, has a Utah trustee who is a resident and citizen of Utah, and is a shareholder of JAB Wireless, Inc.

10. Sibyl Noble is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

11. Kim Bateman is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

12. Bateman IP Law Group, a Professional Corporation is a Utah professional corporation whose home office is located in Utah and who is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

13. Lou Ann Lambert is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

14. Joe Martel is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

15. David Knight is an individual that resides in and is a citizen of Arizona and is a shareholder of JAB Wireless, Inc.

16. Spencer Lambert is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

17. Robert Lambert is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

18. Ben Frei is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

19. Nelly Bateman is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

20. Taz Murray is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

21. Jason Schmid is an individual that resides in and is a citizen of Idaho and is a shareholder of JAB Wireless, Inc.

22. Rocky Mountain Wings, LLC is a Utah limited liability company whose home office is located in Utah and who is a resident and citizen of Utah and is a shareholder of JAB Wireless, Inc.

23. Tyler Andersen is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

24. Dean Andersen is an individual that resides in and is a citizen of Utah and is a shareholder of JAB Wireless, Inc.

25. JAB Wireless, Inc. ("JAB") is a Colorado corporation whose home office is located in Colorado and who is a citizen of the state of Colorado. JAB also conducts business in Utah.

## JURISDICTION AND VENUE

26. The matter in controversy in this action exceeds the sum or value of $75,000, exclusive

of costs and interest, and is between citizens of different states.

27. Jurisdiction is proper pursuant to 28 U.S.C. §1332(a) and §1331.

28. Venue is proper pursuant to 28 U.S.C. §1391(b) as JAB conducts business in Utah and a substantial part of the events and omissions at issue took place in Utah.

## **GENERAL ALLEGATIONS**

29. On or about May 24, 2006, Defendant JAB entered into a Share Purchase Agreement (the "SPA") to purchase 51% of the outstanding interests in Digis, LLC ("Digis"), who is not a party to this action. Defendant JAB representatives involved in the SPA and associated transactions included John S. Koo, John Hunt, Jeff Kohler, Vicki Barone, and Jim Vaughn. The SPA is attached as Exhibit A.

30. On April 17, 2007, Defendant JAB was appointed the Managing Member of Digis.

31. Jim Vaughn ("Vaughn") served both as CEO and as Chairman of the Board of Directors of Defendant JAB from November 2005 until voluntarily resigning from both positions in November 2013.

32. Jeff Kohler ("Kohler") is a founder and has served as Board Member of Defendant JAB beginning on October 28, 2005, and continuing until the present day.

33. Kohler became an executive of Defendant JAB on or about November 2008, and has continued to serve as an executive of JAB until the present day.

34. John S. Koo ("Koo") became a Board Member and executive of Defendant JAB on or about November 2008.

35. In November 2013 Koo was appointed successor to Vaughn as CEO of JAB.

36. Vicki Barone has served as a Board Member of Defendant JAB beginning on October 28, 2005 and continuing until the present day.

37. John Hunt is a partner of ABRY Partners ("ABRY") and served as a Board Member of Defendant JAB from sometime in 2008 until on or about January 2014.

38. The SPA referred to the 51% interests of JAB as "the Class A Shares."

39. The remaining 49% interests in Digis were referred to as "the Class B Shares."

40. The Plaintiffs were holders of the interests in Digis represented by the Class B Shares.

41. Pursuant to the SPA, section 8.2, Defendant JAB had an obligation to purchase all of the assets of Digis upon demand from the Plaintiffs.

42. The Plaintiffs were and are the intended third party beneficiaries of the SPA.

43. The Plaintiffs sent their demand to purchase to Defendant JAB on or about February 26, 2008 ("Demand").

44. Pursuant to this Demand, Defendant JAB arranged for the purchase of the assets of Digis.

45. The purchase price to be paid to the Plaintiffs was based on the "Value of the Company" as defined in the SPA Exhibit A, and this purchase price was to be paid in cash and shares of JAB's common stock ("JAB Shares").

46. To determine the number of JAB Shares to issue to the Plaintiffs, section 8.5 of the SPA required that the JAB Shares be valued at the lower of $2.50/Share, the price of JAB Shares if an independent valuation was performed, or the "Adjusted JAB Share Price."

47. The Adjusted JAB Share Price was the price at which Defendant JAB sold any other JAB shares to any other parties during the period between signing the SPA and closing on the assets of

6

Digis.

48. In other words, if Defendant JAB sold JAB Shares at a lower price than $2.50/share, then Plaintiffs were to receive the number of JAB Shares related to that lower price.

49. On November 5, 2008 JAB completed a transaction to raise $14,000,000 of capital by issuing 14,000 shares of its Series C Preferred Stock to ABRY, Koo-JAB, LLC and Barclays Capital Custodian FBO John S. Koo ("ABRY/KOO").

50. Defendant JAB provided Plaintiffs with a disclosure memorandum dated March 20, 2009 to show many items related to the proposed transaction associated with the Demand ("Memorandum"). The Memorandum is attached as Exhibit B.

51. The Memorandum describes how the number of JAB Shares was determined when it answers the question of "How was the exchange ratio determined?" by stating that the 1,565,000 JAB Shares were "valued in accordance with the provisions of the Purchase Agreement at $2.50 per share." Memorandum pp. 2-3 (emphasis added).

52. To Plaintiffs, it was material that the "exchange ratio", or price of the JAB Shares, had been calculated, as stated in the Memorandum, "in accordance with the provisions of the Purchase Agreement" as they would only accept the JAB Shares if they were calculated based on the lower of $2.50/share or the Adjusted JAB Share Price, as required by the SPA.

53. Since the original SPA, as the value of the JAB shares was a material factor for the Plaintiffs, the Plaintiffs had closely watched the value of JAB shares as the going price of JAB shares was a constant concern for them and materially affected their decision on when and under what terms to file the Demand.

54. Plaintiffs closely monitored various JAB financing transactions to obtain as much information as they could about the going price for JAB shares.

55. However, the Plaintiffs were not parties to the various transactions and always had to rely on Defendant JAB to produce or provide the information necessary to understand the price of the JAB shares.

56. In September of 2007, Defendant JAB circulated an initial draft of the Memorandum. This initial draft served to provide information to the Plaintiffs upon which their Demand was based.

57. As new financing events or other situations would arise, Defendant JAB would modify the Memorandum and send an updated draft.

58. Between September 2007 and March 2009, Paul Lambert received at least seven different drafts of the Memorandum.

59. As the time to close on the Demand began to draw nearer, Plaintiffs increased their investigation of the price per share paid for JAB shares by other parties to determine if they should receive the number of shares based on a $2.50/share valuation or the Adjusted JAB Share Price for shares issued with prices lower than $2.50/share.

60. In the week ending November 14, 2008, Paul Lambert had a conversation with Jeff Kohler. Lambert was specifically seeking understanding to the price per share paid with the ABRY refinancing. In that phone conversation, and as part of the continuing investigation into the value of the JAB shares, Lambert asked Kohler, in essence, "What was ABRY's price per share?" to which Kohler responded, in essence, that there was not an individual price per share,

8

but that the value they put on it would be around $3.75, or maybe $3.50 after a repricing that took place.

61. Ten minutes after this phone conversation ended, and to further set forth the ABRY price per share, Lambert received a follow-up email from Kohler with partial descriptions of the Series C Preferred Stock, with another e-mail following a few hours later with a more complete description of the Series C Preferred Stock.

62. This follow-up e-mail description, which was a continuation of the phone conversation started earlier in the day where Lambert asked "What was ABRY's price per share?", used the term "nominal" as part of the overall description of the ABRY transaction, which closely matched the description of the ABRY transaction in the final Memorandum. At this point in November of 2008, Lambert first saw the term "nominal" to describe the strike price of the warrants issued to ABRY and began seeking to determine its meaning.

63. This follow-up e-mail served to create the foundation for language that was to be included in the Memorandum as part of the updated draft of the Memorandum, and this language closely matched the language in the final Memorandum provided to the Plaintiffs. The term "nominal" was used in both the proposed language and the final Memorandum, and Plaintiffs' understanding of the word "nominal" as it pertained to the ABRY transaction was based on this phone and e-mail exchange as well as subsequent investigations, as discussed further below.

64. This phone conversation and attendant e-mails established the ABRY price per share being associated with the word "nominal", as nothing in the phone conversation or e-mails refuted the original $3.50 - $3.75 value range indicated by Kohler, but only supplemented the

overall understanding of the Plaintiffs that the ABRY transaction was based on a JAB share valuation of approximately $3.50/share.

65. Lambert then met with Jim Vaughn on November 17, 2008 to discuss obtaining some additional compensation due to the long delays in the process of meeting the Demand. Vaughn became upset and asserted that the Plaintiffs were already receiving more than they were entitled to at a $2.50/share valuation.

66. Vaughn's anger and assertions that Plaintiffs were receiving more than they were entitled showed Plaintiffs that it was Defendant JAB's position that Plaintiffs were receiving a better deal than others who purchased JAB shares, meaning that none had been sold for less than $2.50/share.

67. Despite this meeting, and worried about the use of the word "nominal", on November 18, 2008, Lambert called Kohler to request the capitalization table to help him determine the value of the JAB stock. Kohler expressed that it was very complex, and wished Lambert good luck in trying to make heads-or-tails of it.

68. Lambert then had a phone call with Vaughn where Vaughn reiterated that the Plaintiffs were getting more than they deserved at the $2.50/share valuation. Lambert again tried to ask for more compensation due to a comparison of the Digis versus JAB performance, but Vaughn said that the terms of the SPA had to be followed and that additional compensation would not be given. Vaughn also stated that he would not cooperate in an expert comparison of the performance and that he would fight that in court as it was not specifically required by the SPA.

69. Based on this conversation, the Plaintiffs were again led to believe that Defendant JAB

was following the terms of the SPA and that no shares had been issued for less than $2.50/share.

70. On November 19, 2008, Lambert suggested, in another phone call with Vaughn, the possibility of Plaintiffs taking their entire payment in cash, to which Vaughn responded to Lambert that Wispertel bought its stock at a $4.50/share valuation and that if the Plaintiffs wanted to get any "upside" on the deal they needed to take the stock at the $2.50/share valuation.

71. This conversation again confirmed that the $2.50/share valuation was lower than the value of the JAB shares and lower than others paid for the JAB shares.

72. On November 21, 2008, Lambert again called Vaughn to ask some questions about the capitalization table he received from his earlier request as the table he received did not include the AirCanopy or ABRY transactions.

73. Vaughn said that he did not want Lambert to include those transactions in his valuation because they gave credit for cash but did not properly credit what would happen with the cash. Vaughn went on to say that he would send the ABRY documents for review, but that Lambert should not confuse himself with the information about the ABRY deal and that none of the information would do Lambert much good.

74. In this same conversation, Vaughn stated that the "real impact" of the ABRY deal to add to the relevant numbers was an additional $18,600,000, and Vaughn assured Lambert that he could process this information on his own without involving any experts in the valuation.

75. Vaughn, nor anyone else at Defendant JAB, never provided the actual ABRY documents to Lambert, but Vaughn and others did provide representations about the impact of the ABRY transaction.

76. On December 1, 2008, Lambert had another phone call with Kohler, where Kohler stated that the Bathgate investors paid $3.50/share in lieu of an interest payment for their notes.

77. Kohler then represented to Lambert that they do not disclose amounts paid for JAB stock in acquisition documents but like to leave the price "ever so slightly gray".

78. Due to this representation, Plaintiffs were again led to believe that the current value of JAB shares was over $2.50/share and that they had to rely entirely on Defendant JAB for disclosure of the actual prices paid for JAB shares as JAB would not be forthright in their actual documents.

79. On December 3, 2008, Vaughn surprised Lambert by showing up at the office and laying Lambert off before Lambert's contract had run, and stated that Lambert needed to make a final decision on taking the $2.50/share valuation.

80. Vaughn used this tactic to purposely hide the details of the ABRY transaction by placing serious pressure on Lambert to stop investigating and to rely on the representations made so far by Vaughn and Kohler. This tactic also removed Lambert from the office, which made it even less likely that he would be able to discover relevant information.

81. Between December 5, 2008 and March 31, 2009, Lambert participated in over 40 phone calls[1] working through details of the closing, which details included ways to make the

---

1  A non-exhaustive list of these phone calls is as follows: 12/5/08 Jeff Kohler; 12/12/08 Jeff Kohler; 12/15/08 Jeff Kohler; 12/16/08 Jeff Kohler; 1/12/09 Jeff Kohler; 1/12/09 Jeff Kohler; 1/14/09 Jeff Kohler; 1/20/09 Jeff Kohler; 1/23/09 Jeff Kohler; 1/27/09 Jeff Kohler; 1/28/09 Jeff Kohler; 1/29/09 Jeff Kohler; 1/30/09 Jeff Kohler; 2/2/09 Jeff Kohler; 2/10/09 Jeff Kohler; 3/4/09 Jeff Kohler; 3/4/09 Jeff Kohler and Burns Figa; 3/4/09 Jim Vaughn and Jeff Kohler; 3/9/09 Jeff Kohler (3); 3/10/09 Jeff Kohler (4); 3/11/09 Jim Vaughn and Jeff Kohler; 3/11/09 Jim Vaughn; 3/11/09 Conference call with Jeff Kohler, Jim Vaughn, Burns Figa, RGL, Wayne Swan; 3/12/09 Jim Vaughn (2); 3/13/09 Jim Vaughn (2); 3/16/09 Jeff Kohler; 3/17/09 Jim Vaughn; 3/17/09 Jeff Kohler (2); 3/18/09 Jeff Kohler (3); 3/19/09 Jim Vaughn (3); 3/19/09 Jim Vaughn and Jeff Kohler; 3/27/09 Jim Vaughn (2).

transaction more tax efficient and ways to include rights warrants instead of actual shares, as well as participating in numerous e-mail exchanges on wording, disclosure, investigation, and understanding of the documents JAB would provide and the prices others paid for JAB shares.

82. Throughout this time, different valuations of warrants were presented to Lambert, with values ranging from $.61/share (in a phone call with Kohler on January 14, 2009) to $1.80/share (in a conference call on March 11, 2009 including Kohler and Vaughn; Theresa Mehringer and Andrea Welter of Burns Figa & Will P.C.; Steven Hazel and Chris David of RGL Forensics; and Wayne Swan of Durham Jones and Pinegar), with Vaughn using the term "nominal" to refer to this range of values and stating that the $.61/share valuation was artificially low.

83. These various values were in addition to the $3.50 - $3.75 value expressed by Kohler, who also coupled that conversation with saying a "nominal" value.

84. Throughout this time, Lambert constantly pressed the fact that it was material that no shares had been sold for less than $2.50/share and continued to seek assurances and documentation supporting this.

85. As an example, in an e-mail sent on March 4, 2009 to Kohler, Lambert stated that he would accept removal of a 'price protection' provision provided that JAB management would affirm that JAB shares had not been sold for less than $2.50/share. On this same day, Lambert had a phone call with Vaughn where Vaughn assured Lambert that no shares had been issued for less than $2.50/share.

86. On March 5, 2009, Kohler confirmed to Lambert, via e-mail, the removal of the 'price protection' provisions, which indicated to Lambert that Defendant JAB was assuring him that no

shares were sold for less than $2.50/share as the removal of the 'price protection' provisions was contingent on no shares selling for less than $2.50/share.

87. On March 11, 2009, in a phone call with Vaughn and Kohler, Vaughn stated that the $.61/share valuation was artificially low and that it was a "nominal" value not reflecting the true value of the stock, which value Vaughn implicitly set at over $2.50/share.

88. Due to this conversation and previous conversations, Plaintiffs were led to believe and understand that a reference to "nominal" meant a reference to a value not reflecting the true value of the stock, and understood that this was Defendant JAB's typical documentary disclosure method so that it could always leave the true value "ever so slightly gray."

89. As Defendant JAB kept using the term "nominal" to refer to different amounts and to keep the documents "gray", Lambert continued to investigate and seek assurance that no shares had been sold for less than $2.50/share and continued to ask about the valuation. At this point, Lambert had no reasonable way to find out the true value through a searching of the documents provided to Lambert, including the drafts of the Memorandum, as the documents were intentionally kept ambiguous.

90. On March 12, 2009, in a phone call with Vaughn, Vaughn discouraged Lambert from reading the draft of the Memorandum as the draft's main effect is to convince people not to invest due to what the law requires JAB to put in it.

91. On March 13, 2009, Vaughn again stated that the JAB shares are worth at least $2.50/share when Lambert pressed him about a tax opinion. These repeated assurances of the value of the JAB shares caused the Plaintiffs to proceed forward with the closing transaction.

14

92. On March 19, 2009, Lambert asked Kohler if the Plaintiffs were making the right decision, to which Kohler responded by saying "I know it will be worth more in the long-run", again indicating that the Plaintiffs were getting a value better than others who also invested.

93. When Plaintiffs received the Memorandum, everything was in line with previous drafts and proposed language they had seen and previous questions they had asked, and the reference therein to "nominal" was not suspicious as it was in line with previous discussions and documents reviewed by the Plaintiffs, including the e-mail back in November of 2008 using the term "nominal".

94. In other words, as the Memorandum, as issued, followed the same pattern as the disclosures and answers previously given, there was nothing new in the Memorandum that raised any new suspicions by the Plaintiffs as to any wrongdoing on the part of Defendant JAB as all previous inquires had been craftily steered by Defendant JAB and its officers to avoid and conceal the truth associated with "nominal" and the actual price per share paid by ABRY.

95. During this closing process, from November 2008 until March 2009, Lambert spent many hours investigating, searching, comparing, documenting, questioning, and otherwise trying to understand Defendant JAB's previous transactions where JAB shares were issued or sold.

96. At all times, Lambert was seeking to ensure that the Plaintiffs received the lower of $2.50/share or the Adjusted JAB Share Price as this was a material condition of agreeing to the terms of the merger.

97. Due to the duties of the directors and officers of Defendant JAB to disclose all relevant information, the Plaintiffs reasonably relied on the efforts of Lambert investigating and on the

statements of Defendant JAB's officers, including Kohler and Vaughn.

98. Without Defendant JAB and its officers being willing to truthfully disclose this price, the Plaintiffs had no reasonable way, prior to October 2013, to know that Defendant JAB issued shares for less than $2.50/share. Because of this unwillingness to be truthful with the Plaintiffs, further investigation by Lambert or other Plaintiffs would not have revealed this information.

99. Defendant JAB closed on the assets of Digis on or about March 31, 2009, with Plaintiffs relying in good faith on Defendant JAB to comply with the SPA and the repeated assurances of the value of the JAB shares, as well as provide the information necessary to know the appropriate price per share.

100.      Defendant JAB paid $1,618,000 in cash as well as 1,565,000 JAB Shares based on a valuation at $2.50 per share.

101.      Of these proceeds, the Plaintiffs that are part of this suit, received $1,502,800 in cash as well as 1,453,573 JAB Shares at $2.50 per share.

102.      As stated previously above, the Memorandum describes how the number of JAB Shares was determined when it answers the question of "How was the exchange ratio determined?" by stating that the 1,565,000 JAB Shares were "valued in accordance with the provisions of the Purchase Agreement at $2.50 per share." Memorandum pp. 2-3 (emphasis added).

103.      Despite the number of representations and the assurance in the Memorandum that the JAB Shares were "valued in accordance with the" SPA, the Plaintiffs learned in October, 2013 that in November of 2008, Defendant raised funds by providing, among other things, JAB

Shares by way of warrants to purchase the JAB Shares for a total price of less than $2.50/share and a strike price of $.01/share.

104.    Even though millions of JAB Shares were issued with a strike price of $.01/share, Defendant JAB did not disclose the overall purchase price for the shares, or the actual strike price in the Memorandum, and did not provide Plaintiffs with their JAB Shares at the Adjusted JAB Share Price, as required by the SPA.

105.    Instead of disclosing the overall purchase price, Defendant JAB disclosed that "In November 2008, and included in the total warrant number above, JAB issued warrants to ABRY and KOO with a nominal exercise price, to purchase 3,879,245 shares of JAB's Common Stock, 300,792 shares of JAB's Series A preferred stock, and 352,431 shares of JAB's Series B preferred stock which represents 16.99% of JAB's fully-diluted shares outstanding…" Memorandum p. 54 (emphasis added).

106.    Due to the previous conversations, e-mails, and discussions referenced previously, the Plaintiffs had an understanding that the description of the ABRY transaction in the Memorandum, which includes the word "nominal", referred to a value of greater than $2.50/share.

107.    None of the Plaintiffs knew that Defendant had issued JAB Shares for less than $2.50/share.

108.    The Plaintiffs did not have access to the information regarding all prices at which the shares had been issued or were expected to be issued when Defendant JAB closed on the assets of Digis.

109.     Defendant JAB's representatives, including, John S. Koo, John Hunt, Jeff Kohler, Vicki Barone, and Jim Vaughn, knew that Defendant JAB had sold shares for less than $2.50/share by way of warrants with a strike price of $.01/share because they were either a beneficiary of the deal, intimately involved with the deal, or on the board and approved the deal with ABRY where the shares were issued with a strike price of $.01/share.

110.     Defendant JAB's representatives, including, John S. Koo, John Hunt, Jeff Kohler, Vicki Barone, and Jim Vaughn, were either Directors on the board at JAB or officers of JAB at the time of the merger and knew that the Plaintiffs were not provided with the lowest price for JAB Shares, as required by the SPA.

111.     The Plaintiffs reasonably and justifiably relied on Defendant JAB to disclose to them and to provide them with the lowest price for JAB Shares as provided in the SPA, and the Plaintiffs conducted a reasonable investigation into the actual price per share associated with the ABRY transaction.

112.     The Plaintiffs would not have allowed the closing to take place at $2.50/share if they had known the "Adjusted JAB Share Price" which was tied to the strike price of $.01/share received by others and which was less than $2.50/share.

113.     In April 2012, Lambert accepted an employment position as Engineering Manager for Defendant JAB and is presently employed with Defendant JAB in this position.

114.     In October 2013, with the anticipation that Defendant JAB was going to sell its assets to Vector Bank, Shiraz Moosajee, a previous CFO of JAB and a major shareholder of Defendant JAB, circulated among many JAB shareholders a document which detailed the

18

shareholder payout calculations ("SPC") that would occur if the offer from Vector Bank were approved by the JAB shareholders.

115.    After reviewing the SPC, the Plaintiffs suspected that the SPA had been breached by Defendant JAB because in a comparison of return on investment between ABRY/KOO and the Plaintiffs, the ABRY/KOO returns were dramatically higher, which was an indication that ABRY/KOO had been provided its shares, or the benefit thereof, at a price below $2.50 per share prior to the Merger in March 2009.

116.    However, to not be disruptive to the potential sale of JAB assets, the Plaintiffs held back further investigating the suspected breach during the period for which the Vector Bank due diligence took place.

117.    In November 2013 it was announced by JAB that it had failed to negotiate to sell the JAB assets to Vector Bank.

118.    In November 2013 Jim Vaughn resigned both his position as CEO and his position as Chairman of the Board of Directors of Defendant JAB.

119.    In November 2013 John S. Koo ("Koo") was appointed as CEO of Defendant JAB by its Board of Directors.

120.    After the failed negotiations, Plaintiffs decided to proceed to investigate the suspected breach of the SPA by Defendant JAB.

121.    In an exchange of emails and phone conversations with the management of JAB, Bateman, and Lambert, the Plaintiffs came to a conclusion that the SPA had in fact been breached by Defendant JAB by its act of providing ABRY/KOO its shares, or the benefit thereof,

19

at a price below $2.50 per share. However, at this point in time it was still not clear to the Plaintiffs what the Adjusted JAB Share Price should have been as there was still information regarding the ABRY transaction that JAB had not disclosed.

122.     On November 26, 2013, after his efforts to meet in person with Koo were ignored, Bateman sent a letter to JAB seeking a resolution of its breach of the SPA.

123.     On December 11, 2013 Bateman received a response letter from JAB stating, among other things, that ABRY had received the warrants with a strike price of $.01/share as part of a package for the Series C investment, but it did not state how much ABRY paid for the warrants.

124.     In January 2014 ABRY exercised its millions of JAB warrants for $.01 per share.

125.     In a meeting on January 27, 2014 between Koo and Lambert, Koo reiterated that ABRY received its warrants as part of an investment package. Koo also disclosed that because of JAB offering the warrants, ABRY accepted the lower 12.5% annual dividend on the Series C preferred shares when ABRY was otherwise requiring a 15% annual return.

126.     In this same meeting, Koo told Lambert that Kohler must have misspoke, back in November 2008, when Kohler said that $3.75/share was the value ABRY had put on the shares.

127.     In the conversations that took place with Defendant JAB management between November 2013 and February 2014, it became clear to the Plaintiffs that the SPA had been breached as ABRY had been given shares for less than $2.50/share, and Defendant JAB was unwilling to provide a resolution to the breach.

128.     Based upon Koo's representation that ABRY had accepted a lower 12.5% annual

return when ABRY was targeting a 15% annual return in exchange for warrants, the Plaintiffs were able to determine, using the formula for pricing traditional warrants sold as part of a preferred offering, that the true value that ABRY paid for its shares, including the $.01/share strike price, was well below the "above" $2.50/share price that had repeatedly been represented to Plaintiffs by Defendant JAB.

129.    In March 2014 in conjunction with a refinance of its debt, JAB redeemed ABRY its Series C Preferred shares according to their contract for a large profit to ABRY.

130.    In addition, ABRY sold its millions of JAB shares that it had acquired to a third party for $2.18 per share, making an additional profit of at least $1.755 per share on top of the profits it received from the redemption of its Series C Preferred shares.

131.    The Plaintiffs only discovered in the months between October, 2013 and February 2014 that Defendant JAB provided these JAB Shares for less than $2.50/share.

132.    Defendant JAB issued other warrants and disclosed the actual price per share associated with those warrants.

133.    However, Defendant JAB did not disclose any actual share prices for warrants with a share price less than $2.50/share even though such shares were issued to Defendant JAB board members and ABRY. Instead, Defendant JAB referred to such strike price per share as "nominal."

134.    Defendant JAB also had the contractual obligation to adjust the Adjusted JAB Share Price proportionally when "JAB <u>subdivides</u> the JAB common stock, by split-up <u>or otherwise, or</u> issues additional shares of its Stock <u>as a dividend</u>…" SPA § 8.5(b) (emphasis

added).

135.     The warrants to purchase JAB Shares for $.01/share were granted in connection with issuance of Series C Preferred Shares which sold for $1,000/share.

136.     The Series C Preferred Shares pay a 12.5% annual dividend, paid each quarter, and are fully redeemable for $1,000/share plus accrued dividends at a liquidation event or six years after issuance.

137.     Payment on the Series C Preferred Shares is senior to the right of the holders of JAB Shares of common stock.

138.     As the holders of the Series C Preferred Shares have the right to receive their entire investment back, plus 12.5% annual interest, paid quarterly, the warrants to purchase JAB Shares at $.01/share were additional 'cream on the top' for the holders of the Series C Preferred Shares.

139.     Under the terms of the most recently contemplated transaction to sell the company to a third party, the holders of the Series C Preferred Shares would have been given a combined return on investment in excess of 100% while the return on investment for the Plaintiffs over that same period would have been a 59% loss, giving back only 41% of their investment even though Plaintiffs were supposed to receive equal treatment with these holders as to the common shares under the SPA.

140.     The portion of the return given to the holders of the Series C Preferred Shares that was 'cream on the top' was in excess of 1000%.

141.     Pursuant to the SPA § 8.5(b), the warrants to purchase JAB Shares at $.01/share

are appropriately classified as one or more of the following:

    a.  As Defendant JAB selling shares at a price below $2.50;

    b.  As Defendant JAB subdividing JAB common stock, as a price of $.01/share is basically the same as a price of $.00/share due to the fact that no real consideration is received for the additional shares issued; and/or

    c.  As Defendant JAB issuing "its Stock as a dividend" to the holders of the Series C Preferred Shares.

142.    Despite the provisions in the SPA, Defendant JAB did not make the required adjustments or disclose the facts requiring such adjustments.

143.    At all times, Plaintiffs reasonably and justifiably relied on Defendant JAB to provide complete and accurate information, and reasonably investigated the matters that were within their power to investigate.

144.    Plaintiffs were required to retain attorneys to enforce their rights under the SPA.

### FIRST CLAIM FOR RELIEF
**Breach of Contract**

145.    Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

146.    Based on consideration received, the SPA was executed by Defendant JAB.

147.    In the SPA section 8.02, the Plaintiffs, as shareholders of Digis, were granted certain rights related to requiring Defendant JAB to purchase the assets of Digis.

148.    Defendant JAB knew about these rights and agreed to these rights.

149.    Pursuant to the SPA, the Plaintiffs filed their Demand on Defendant JAB

requiring Defendant JAB to purchase according to the provisions in the SPA.

150.     Defendant JAB recognized their right to file the Demand and commenced towards closing on Defendant JAB's purchase obligation.

151.     Defendant JAB represented that it was following "the provisions of the Purchase Agreement [or SPA]…", Memorandum pp. 2-3, when it valued the JAB Shares at $2.50/share.

152.     However, despite the representation, Defendant JAB did not follow the provisions of the SPA as the SPA required the price per share to be adjusted based on a price lower than $2.50/share for which others received shares, on stock splits, and on stock dividends.

153.     Defendant JAB never disclosed the true price per share or made these adjustments.

154.     As these adjustments were not made by Defendant JAB, and Defendant JAB did not use the Adjusted JAB Share Price as it was required to use, Defendant JAB breached the SPA by not providing Plaintiffs with the number of shares related to the Adjusted JAB Share Price.

155.     Defendant JAB breached the express provision of section 8.5(b) of the SPA by not providing shares based on the Adjusted JAB Share Price.

156.     Plaintiffs did not have access to the necessary information to determine if Defendant JAB was complying with the SPA.

157.     Plaintiffs made diligent effort, as outlined above, to discover and verify that no shares had been sold for less than $2.50/share.

158.     Plaintiffs had to rely, and justifiably did rely, on Defendant JAB and the representations of its agents to determine if the SPA was being followed.

159.     Plaintiffs have been damaged as they did not receive the benefit of their bargain and because their interests in the JAB Shares were harmed due to others receiving priority and JAB Shares at less than $2.50/share.

160.     At a minimum, the Plaintiffs were entitled to be offered the best price made available to other purchasers of the JAB Shares which benefit they have not heretofore received.

161.     The SPA is an instrument evidencing debt, and Plaintiffs are maintaining this action to enforce their rights under the SPA.

162.     The amount Defendant JAB owes to the Plaintiffs is an unliquidated, determinable amount of money determined by reference to the SPA, as Plaintiffs' damages are determined by the difference in the number of shares they should have received using the Adjusted JAB Share Price multiplied by the profit per share received by ABRY on the same type of shares.

163.     Wherefore, Plaintiffs are entitled to a judgment against Defendant JAB in an amount of at least $12,442,585, or rescission of the agreement, as applicable, as well as interest and all costs and fees associated with maintaining this action.

## SECOND CLAIM FOR RELIEF
### Breach of Fiduciary Duty

164.     Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

165.     The warrants issued at a strike price of $.01/share and a total purchase price of less than $2.50/share were issued to members of Defendant JAB's board of directors ("Directors").

166.     The Directors knew that these warrants were issued at a strike price of $.01/share and for an overall price of less than $2.50/share.

167.     Some of the Directors could potentially receive over millions in dollars in profits from these warrants.

168.     The Directors were in a position and under a duty to disclose this information to Plaintiffs.

169.     Instead of disclosing the actual price per share, the Directors chose to use an ambiguous term of "nominal" to conceal the actual price.

170.     Kohler and Vaughn, over an extended period of time, made numerous references to "nominal" values to describe prices ranging from $.61/share to approximately $3.50/share.

171.     Defendant JAB's use of "nominal" during Plaintiffs' inquiries into pricing followed a pattern of concealment and non-disclosure as the Plaintiffs were led to understand that "nominal" could mean a price of over $2.50/share.

172.     As the Directors did not disclose the actual price paid by ABRY for the JAB shares, the Plaintiffs' asked what the actual price of the shares was set at, at which point it was conveyed to the representative that the price was approximately $3.50 - $3.75/share.

173.     The Directors gave the Plaintiffs reassurance that JAB Shares had not and were not expected to be issued for less than $2.50/share, including reassurances on March 4 and 13, 2009, well after the Directors began using the term "nominal" to describe the value of the JAB Shares.

174.     The transaction that included Plaintiffs was classified by Defendant JAB as a

merger, and Plaintiffs had to vote on the proposed merger.

175.     To enable the Plaintiffs to have an informed vote on the details of the merger, Defendant JAB prepared and provided the Memorandum.

176.     Defendant JAB knew and intended that Plaintiffs would rely on this Memorandum when making their decisions, but they also knew that this Memorandum omitted necessary information, such as the Adjusted JAB Share Price, and that the Plaintiffs were relying on the Directors to truthfully disclose this information.

177.     Despite this, Defendant JAB did not disclose sufficient information relating to the warrants to enable the Plaintiffs to make an informed decision, but followed the same course of conduct by referencing ambiguous terms with definitions previously established in prior discussions and e-mails.

178.     Due to the fact that, among other things, the Directors could profit immensely from the warrants, the SPA imposed adjustment obligations on Defendant JAB related to the price of the JAB Shares, the Directors maintained special positions of knowledge, laws exist requiring a full and complete disclosure, the Plaintiffs had to rely on, and justifiably did rely on, and trust Defendant JAB to fully disclose all information, and the Directors were disclosing information to future shareholders of Defendant JAB, Defendant JAB and its Directors had a fiduciary duty to provide full, complete, and accurate information to the Plaintiffs.

179.     Defendant JAB and the Directors did not provide full, complete and accurate information as they did not disclose the strike price of $.01/share or the actual purchase price.

180.     This failure to disclose is a course of conduct by the Directors of self-dealing to

the detriment of the Plaintiffs.

181.     This failure to disclose was a breach of the fiduciary duty owed to the Plaintiffs.

182.     Plaintiffs were directly damaged by the failure to disclose all information.

183.     Wherefore, Plaintiffs are entitled to a judgment against Defendant in an amount of not less than $12,442,585, as well as other appropriate equitable relief, as well as interest and all costs and fees associated with maintaining this action.

**THIRD CLAIM FOR RELIEF**
**Fraudulent Non-Disclosure**

184.     Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

185.     Defendant JAB knew that the Plaintiffs were entitled to the benefit of section 8.5(b) of the SPA.

186.     Defendant JAB also knew that it had issued JAB Shares for less than $2.50/share by way of issuing warrants to purchase those shares with a strike price of $.01/share.

187.     The warrants with a strike price of $.01/share were issued just a few months prior to the closing pursuant to the Plaintiffs' Demand, and so Defendant JAB had sufficient time to disclose the details, and the transaction was within a close enough timeframe that the Directors and others involved would still have this price fresh in their memory.

188.     For all warrants with strike prices at or above $2.50/share, Defendant JAB disclosed the actual price per share in the Memorandum.

189.     However, when it came to the warrants with a strike price of $.01/share, Defendant JAB elected to use the word "nominal" to conceal the actual share price.

190.     The word "nominal" is an ambiguous word that can only be understood in context or in relation to what is being compared, as an additional $1,000 charge on a $1,000,000 transaction could be classified as a "nominal" charge, as could a $2.50 charge on a $1,000 transaction.

191.     In addition to the use of the word "nominal", Defendant JAB, through its officers Vaughn and Kohler, on the dates specified in the Complaint above, confirmed that no shares had sold for less than $2.50/share and maintained a course of conduct designed to keep information from the Plaintiffs that would allow them to understand that shares were sold for less than $2.50/share.

192.     For example, Plaintiffs were provided with a capitalization table that did not include the ABRY transaction, and when Lambert asked about the details on the ABRY transaction, he was told that it was not worth providing due to its complexity, but that the important piece, or the overall impact of the transaction, was $18,600,000 in additional capital to Defendant JAB.

193.     Kohler would encourage Lambert to calculate the value himself based on this capital and the number of shares known to Lambert at the time, and would confirm that values in the range of $3.50 - $3.75 sounded about right.

194.     As the warrants were issued as an additional item in a transaction involving shares selling at $1,000/share, it was reasonable for the Plaintiffs to believe that ABRY paid a price of $3.75/share for warrants with a "nominal exercise price," especially since this understanding was also conveyed by representatives of Defendant JAB.

195.     Defendant JAB's election to treat the $.01/share warrants different from the other warrants evidences intent to keep information away from the Plaintiffs.

196.     In addition, Defendant JAB's officers course of conduct, ranging from laying Lambert off when he was investigating the ABRY purchase price, to omitting ABRY details on disclosure documents, to treating the ABRY transaction in the Memorandum different from other transactions, to confirming that no shares were issued for less than $2.50/share to induce Plaintiffs to stop investigating the ABRY transaction, all evidence intent by the Defendant to not disclose material information to the Plaintiffs.

197.     Defendant JAB and its representatives knew that the price per share was a material item for the Plaintiffs.

198.     Defendant JAB and its representatives also knew that the Plaintiffs were entitled to receive the lowest price per share that was given to others.

199.     The SPA did not expressly require Defendant JAB to disclose all information related to all other financing transactions, but the law requires Defendant JAB to fully disclose the information related to prices per share that are less than $2.50/share.

200.     Defendant JAB did not want to provide Plaintiffs with JAB Shares valued at the ABRY price per share even though others, such as ABRY, were provided with JAB Shares at this price.

201.     Defendant JAB intentionally omitted the actual price per share of the warrants and intentionally sought to keep the necessary information away from the Plaintiffs

202.     Defendant JAB intended the Plaintiffs to rely on the disclosures made in the

Memorandum as well as the representations made by its representatives, and intended the Plaintiffs to proceed in the absence of full disclosure as full disclosure would have changed the conduct of the Plaintiffs.

203.     Defendant JAB knew that the Plaintiffs would rely on the Memorandum as being a full, complete, and accurate disclosure since it embodied the previous discussions, omissions, definitions, and understandings created by the purposeful and intentional manipulation of Plaintiffs' understanding of the transaction.

204.     The Plaintiffs did in fact justifiably rely on the Memorandum and the representations of Defendant JAB's representatives, as well as the definitions created by the course of conduct and intentional omissions of Defendant JAB's representatives.

205.     The Plaintiffs' reliance on Defendant JAB and the understandings it created through false representations and non-disclosure has caused harm and damage to the Plaintiffs.

206.     The Plaintiffs' harm and damage is a direct result of Defendant JAB's omissions.

207.     Defendant JAB had an independent duty to fully disclose all relevant information to the Plaintiffs.

208.     Defendant JAB's main fraud was the non-disclosure of the ABRY purchase price for the warrants, and the course of conduct of Defendant JAB and its officers and directors, including laying Lambert off, intentionally using ambiguous terms to keep things "gray", referring to a range of values as "nominal", repeatedly assuring the Plaintiffs that no shares had been sold for less than $2.50/share, providing capitalization tables with missing and incomplete information, in addition to being fraudulent activity itself, all evidence an intent, scheme, artifice,

31

plan and effort to maintain this fraud and perpetuate it upon the Plaintiffs.

209.     Wherefore, Plaintiffs are entitled to a judgment against Defendant in an amount of not less than $12,442,585, or rescission of the agreement, as applicable, as well as other appropriate equitable relief, as well as interest and all costs and fees associated with maintaining this action.

## FOURTH CLAIM FOR RELIEF
### Misrepresentation

210.     Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

211.     This claim is made in the alternative to the claim above in the event there is no finding of intent under the claim for relief above.

212.     Defendant JAB omitted necessary details and made affirmative representations related to the proper price for the JAB Shares.

213.     At a minimum, the omission, if not intentional, was due to Defendant JAB's negligence.

214.     At a minimum, the affirmative representations from Defendant JAB's representatives related to the purchase price being around $3.75/share and the repeated reassurances that JAB Shares had not and were not expected to be issued for less than $2.50/share were negligent.

215.     At a minimum, the affirmative representations from Defendant JAB related to the value that ABRY placed on the shares being around $3.75/share when no such valuation had taken place, and leading the Plaintiff to the false belief that the shares they were purchasing were

worth more than $2.50/share, were negligent.

216.     Defendant JAB had a duty to provide Plaintiffs with full, complete, and accurate information.

217.     Defendant JAB breached its duty and standard of care by misrepresenting the actual price of the warrants and omitting the actual price of the warrants from the documents.

218.     Had Plaintiffs known the actual price that ABRY paid per share, Plaintiffs would not have agreed to close on the transaction without requiring Defendant JAB to make proper adjustments to the number of JAB Shares received by the Plaintiffs.

219.     These misrepresentations directly caused the Plaintiffs harm and damaged the Plaintiffs.

220.     Wherefore, Plaintiffs are entitled to a judgment against Defendant in an amount of not less than $12,442,585, or rescission of the agreement, as applicable, as well as other appropriate equitable relief, as well as interest and other costs, including filing fees, as well as interest and all costs and fees associated with maintaining this action.

<u>FIFTH CLAIM FOR RELIEF</u>
**Breach of Covenant of Good Faith and Fair Dealing**

221.     Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

222.     This allegation is made in the alternative to the Third Claim for Relief in the event that the Court finds that the Third Claim for Relief is time barred or that the non-disclosure did not rise to the level of fraud.

223.     Pursuant to section 8.5 of the SPA, the JAB Share price was to be based on the

Adjusted JAB Share Price, which was the lowest price per share for shares sold to others for less than $2.50/share.

224.     However, the SPA did not expressly state that Defendant JAB was to provide the Plaintiffs with knowledge of the lowest price per share paid by others for JAB shares.

225.     Based on the lack of access to information, Plaintiffs had to rely on Defendant JAB to furnish accurate information.

226.     Every written contract has an implied covenant of good faith and fair dealing obligating the parties to act within the reasonable expectations of the other party that are not specifically set forth in the contract.

227.     As the SPA required that Plaintiffs be given shares based on the Adjusted JAB Share Price, and the only way for the Plaintiffs to know this price was for Defendant JAB to disclose the information, the Plaintiffs reasonably expected Defendant JAB to provide the necessary information and for Defendant JAB to comply with the SPA.

228.     When Defendant JAB agreed to section 8.5 of the SPA, the parties reasonably expected Defendant JAB, among other things, to provide the information necessary to Plaintiffs to know that Defendant JAB had fulfilled the requirements of the Adjusted JAB Share Price.

229.     Defendant JAB opted instead to cloak the real price of the warrants under the use of the term "nominal" in its description of the ABRY transaction and to mislead Plaintiffs by giving them false assurances and omitting important information necessary for Plaintiffs to understand what the Adjusted JAB Share Price should be.

230.     These actions of non-disclosure violated the reasonable expectations of the

Plaintiffs and violated the implied covenant of good faith and fair dealing under the SPA.

231.     This violation of the covenant of good faith and fair dealing directly damaged the Plaintiffs.

232.     In other words, Defendant JAB's failure to follow the express terms of the SPA by not providing the Adjusted JAB Share Price to Plaintiffs constitutes an express breach covered by the first cause of action, while Defendant JAB's failure to disclose relevant information constitutes a breach of the implied covenant of good faith and fair dealing.

233.     The SPA is an instrument evidencing debt, and Plaintiffs are maintaining this action to enforce their rights under the SPA.

234.     The amount Defendant JAB owes to the Plaintiffs is an unliquidated, determinable amount of money determined by reference to the SPA, as Plaintiffs' damages are determined by the difference in the number of shares they should have received using the Adjusted JAB Share Price multiplied by the profit per share received by ABRY on the same type of shares.

235.     Wherefore, Plaintiffs are entitled to a judgment against Defendant in an amount of not less than $12,442,585, or rescission of the agreement, as applicable, as well as other appropriate equitable relief, as well as interest and all costs and fees associated with maintaining this action.

### SIXTH CLAIM FOR RELIEF
### Federal Securities and Exchange Act Violations

236.     Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

237.     Defendant JAB sold JAB Shares to the Plaintiffs through unregistered offers and sales of securities.

238.     The JAB Shares sold are securities as defined by Federal law, and are regulated by Federal law.

239.     Defendant JAB effected the sale of these securities at $2.50/share by omitting to disclose material information to the Plaintiffs that would have made Plaintiffs unwilling to purchase the securities for $2.50/share.

240.     Specifically, Defendant JAB did not disclose to the Plaintiffs that it had sold JAB Shares for less than $2.50/share.

241.     Defendant JAB knew this information was material to the Plaintiffs as the Plaintiffs had made clear they were only purchasing the securities for $2.50/share if other investors had not purchased the same type securities for less than $2.50/share.

242.     Defendant JAB engaged in a course of conduct designed to keep Plaintiffs from discovering the actual price paid by ABRY and others for the JAB Shares, and this course of conduct included a manipulative and deceptive device and contrivance, plan, scheme, artifice, and intent to use ambiguous terms, define those terms in a false light, make false representations, and continuously omit information related to the ABRY transaction.

243.     These actions affected interstate commerce and violated Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5, promulgated thereunder.

244.     Defendant JAB, as a Colorado entity, used e-mails and the phone system to make representations and intentionally omit material information to the Plaintiffs, most of whom are and were located in Utah.

245.     Defendant JAB violated Section 10(b) of the 1934 Act and SEC Rule 10b-5(a) by employing a device, scheme, and artifice to defraud the Plaintiffs by intentionally using ambiguous terms, intentionally using those terms to create definitions that were false as it related to the actual situation and security at hand, laying Lambert off to keep him from discovering information, making false representations and assurances about the value of the shares and the values at which others had purchased shares, and ultimately omitting the very information known to Defendant JAB to be the material item in Plaintiffs deciding to purchase the securities in connection with the purchase or sale of securities.

246.     Defendant JAB violated Section 10(b) of the 1934 Act and Rule 10b-5(b) by omitting the material fact in all of its disclosures and discussions with the Plaintiffs of the value at which ABRY and others purchased shares in connection with the purchase and sale of securities and by affirmatively representing false values placed on the JAB shares by other investors, such as with Kohler's representation in November of 2008.

247.     The disclosure of the actual purchase price of these shares was necessary in order to make Defendant JAB's other statements made, in light of the circumstances under which they were made, not misleading.

248.     Defendant JAB violated Section 10(b) of the 1934 Act and Rule 10b-5(c) by engaging in actions, practices, and a course of business that operated in connection with the

purchase and sale of a security as a fraud by acting intentionally to keep things "gray", to use ambiguous terms with false definitions, as it related to this situation, created and perpetuated by Defendant JAB and its officer and directors as detailed above, to lay off key employees who were trying to investigate and discover relevant information, to make false representations and assurances, and to otherwise intentionally omit information Defendant JAB knew to be material and knew would alter Plaintiffs' actions and decisions related to the securities.

249.    In connection with the merger, Defendant JAB provided some information to the Plaintiffs, but maintained a plan to selectively disclose information and to not disclose other information material to Plaintiffs in making a decision to sell their remaining Digis securities in exchange for a purchase of Defendant JAB securities through the merger.

250.    In addition to the items above, Defendant JAB and its officers made specific misrepresentations of material fact and material omissions of fact as described in the preceding paragraphs including, but not limited to, the following:

      a.    Conveying to Plaintiffs' representative that ABRY's valuation of the stock was around $3.50 - $3.75/share;

      b.    Stating that the warrant strike price on the stock was "nominal" instead of disclosing the actual price of $.01/share;

      c.    Laying Lambert off prior to his contract expiring to prevent him from having access to the necessary information;

      d.    Representing on numerous occasions that no shares had been sold for less than $2.50/share;

e.     Creating understandings of the word "nominal" to include values from $.61/share to $3.75/share;

f.     Omitting necessary details of the ABRY transaction, such as the affect it had on the capitalization table and the value of the JAB Shares; and

g.     The other representations and omissions outlined above, including in the General Allegations section of this Complaint.

251.    Defendant JAB, through its officers, acted knowingly, with scienter, and recklessly, by making the misrepresentations and material omissions identified in the preceding paragraphs of this Complaint.

252.    Specifically, Kohler and Vaughn had the intent and purpose of keeping material information from the Plaintiffs as the officers and directors stood to profit immensely from the ABRY transaction if the Plaintiffs did not receive the same treatment and the JAB Shares for the Adjusted JAB Share Price.

253.    Defendant JAB made these misrepresentations and withheld material information in order to induce Plaintiffs to accept shares at a $2.50/share valuation instead of the Adjusted JAB Share Price valuation they were entitled to receive.

254.    Plaintiffs reasonably relied upon the material misrepresentations and omissions in receiving the shares at the contractual price which was an amount equal to the lesser of 1) the lowest price sold to third-parties between 2006 and 2009 or, 2) $2.50/share.

255.    Plaintiffs have been injured and continue to be injured and suffer economic loss as a direct result of the material misrepresentation and omissions described herein.

256.    Defendant JAB's main fraud was the non-disclosure of the ABRY purchase price for the warrants, and the course of conduct of Defendant JAB and its officers and directors, including laying Lambert off, intentionally using ambiguous terms to keep things "gray", referring to a range of values as "nominal", repeatedly assuring the Plaintiffs that no shares had been sold for less than $2.50/share, providing capitalization tables with missing and incomplete information, in addition to being fraudulent activity itself, all evidence an intent, scheme, artifice, plan and effort to maintain this fraud and perpetuate it upon the Plaintiffs.

257.    Plaintiffs would not have suffered such losses but for the material misrepresentations and omissions, the devises, schemes and artifices, and the fraudulent and deceitful transactions and practices of Defendant JAB, which schemes included a long pattern of omitting information, creating false impressions, using ambiguous definitions in other contexts, and representing false values, all as outlined above in the General Allegations section of this Complaint.

258.    In summary, Defendant JAB's actions as outlined in this Complaint meet the elements to establish a claim under Rule 10b-5:

   1) Manipulation or deception, artifices, schemes, intent to defraud – Defendant employed a scheme to keep Plaintiffs from knowing the actual sale price of the JAB shares in the ABRY transaction, and manipulated the facts, made misrepresentations, omitted necessary information, and otherwise acted as outlined above;

   2) Materiality – The purchase price of the JAB shares was a material item for the

40

Plaintiffs and was known to the Defendant to be a material item, as well as the reasons outlined above;

3) In Connection With – Defendant's actions and fraudulent conduct were taken in connection with the purchase or sale of JAB shares, which constitute securities, as Defendant JAB's actions were taken in direct relation to the Plaintiffs' purchase of the JAB shares and were taken to induce the Plaintiffs to purchase the JAB shares, as well as the reasons outlined above;

4) Scienter – Defendant JAB knew of its course of conduct as Defendant JAB's officers and directors were intimately familiar with the ABRY transaction as they stood to profit immensely from the transaction and were part of the transaction, and Defendant JAB knew of its misrepresentations but made them to further its own interests and the interests of its officers and directors, as well as the other reasons outlined above;

5) Standing – Plaintiffs purchased the JAB shares at issue in this matter and qualify as purchasers under the Rule, as well as the reasons outlined above;

6) Reliance – Plaintiffs relied on Defendant JAB's representations, including the representations of the ABRY value per JAB share, the representations that no JAB shares had sold for less than $2.50/share, and Plaintiffs would not have purchased the JAB shares for $2.50/share if they had known of the actual value at which JAB shares were sold, as well as the other reasons outlined above;

7) Causation – Defendant JAB's conduct outlined above was the actual and direct

cause of Plaintiffs' losses, as Plaintiffs suffered damages by not receiving the Adjusted JAB Share Price and by purchasing overpriced securities and would not have purchased these securities at $2.50/share if Defendant JAB had truthfully disclosed all of the material information;

8) Damages – Plaintiffs have suffered the damages set forth herein by not getting the benefit of their contract and have suffered a loss on their investment due to purchasing overpriced securities.

259.    As a direct result of Defendant's violations of these acts, Plaintiff has suffered damages in an amount to be determined at trial, but in no event less than $12,442,585, plus interest, costs, and attorneys' fees.

260.    Wherefore, Plaintiffs are entitled to a judgment against Defendant in an amount of not less than $12,442,585, or rescission of the agreement, as applicable, as well as other appropriate equitable relief, as well as interest and all costs and fees associated with maintaining this action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray this Court for judgment against Defendant as follows:

1. For judgment against Defendant in an amount of at least $12,442,585.

2. For equitable relief as may be appropriate.

3. For the attorney fees, in an amount to be established by affidavit, incurred by Plaintiffs in bringing this action against Defendant.

4. For the court costs, service fees, and other expenses necessary to bring this action against

Defendant.

5. For pre-judgment and post-judgment interest.

6. For reasonable costs incurred by Plaintiffs to collect the judgment.

7. For all other relief as this Court deems just and equitable under the circumstances.

DATED this 21st day of November, 2014.

|  |  |
|---|---|
|  | /s/ Cole S. Cannon |
| Plaintiffs' Address | Cole S. Cannon, Esq. |
| 53 S. 600 East | Austin J. Hepworth, Esq. |
| Salt Lake City, UT 84102 | *Attorneys for Plaintiffs* |

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of November, 2014, I electronically uploaded the foregoing Plaintiffs' Second Amended Complaint with the Clerk of the Court using the CM/ECF system with electronic notification of such filing to be sent to the following:

Mark O. Morris
Ricky Shelton
SNELL & WILMER, LLP
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101-1531

Sara Cantrick Van Deusen
BURNS FIGA & WILL PC
6400 S Fiddlers Green Circle, Ste. 1000
Greenwood Village, CO 80111

/s/ Austin J. Hepworth
Cannon Law Group

44